Good morning, dear leaders. My name is Joy Rogers-Lowe, and I'm here at the Center for Law and Human Rights today. I'm here representing the Petitioners in the CDC for our Independence Bill. I'm going to raise three issues in this petition for review, and I'm going to address each of these briefly this morning, and I'm also hoping to say them after you have heard them. So, the first issue is whether or not there was an instant piece of discussion from EPA to allow the State of Arizona to conclude that it had 135 exceedances that occurred over 25 days in a two-year period in order to demonstrate a clean and transparent system Now, the second issue is whether or not there was an instant piece of discussion from EPA to allow the State of Arizona to conclude that it had 135 exceedances that occurred over 25 days in a two-year period in order to demonstrate a clean and transparent system  I started off with myself, I think, as a former environmental lawyer, and I'm going to talk very briefly about that. But I'm going to talk briefly about the other issues. In turning to the first issue of the petition, I think one of the things that I really want to emphasize this morning is the shared variance in the data that is being included here. We're talking 135 exceedances over 25 days in a two-year period. There are other exceedances in the following years that EPA can determine. So, they're technically not part of this record, but we'll take that into consideration. And it's irreflected on the Environmental EPA California Certified Supreme Court Exceedance Act. A sufficient number of exceedances to cause violation of the standards, the Q-10 standards. These four exceedances, these are not all exceedances. So, if there are any exceedances, four exceedances, any that occur over a three-year period. So, EPA, California, California, there are many of them. But in the evaluation of these exceedances, it may seem like I've followed it straight. It's just that I'm not a technical specialist, so I'm going to follow the technical specifics of this. And in such a case, we agree that these need to be ruled for exceedance or analysis. And we're not going to report any to the EPA. And that's why this was part of the original consultation. So, I'll end things. You didn't hear me answer your question. But did you see the law? Is that part of it that you didn't hear me talk about? I really didn't and realized that this is their EPA's discretion. But this Court doesn't have the authority to review their discretion. And so, we are not understanding. We disagree with your honor that the EPA variations with the three-part standard variance. We did not hear because it was only in response to time. And also, not in response to time. In my opinion, the EPA's response is not to be discretionary. It should be more about the laws, which are in effect in the community, not just in our jurisdictions, or maybe their reasons for why they should be discretionary. We don't have any evidence of that. So, how do you say that? Well, Your Honor, this Court, I mean, the whole reason I didn't see a review is to be able to evaluate whether they exercised their discretion in any reasonable manner in which they did not record authority. And their reason, their justification, that they did offer a vote, just on their lawful assertion, first week or second week, they touched the significance of agricultural emissions, which is a big part of this issue. And they look at the elementary as opposed to the sources of emissions or the individual claims where the record demonstrates that students who are diagnosed with these emissions, I would say, all acknowledge that agricultural emissions were a big part of this. And certainly, they say, I would say, well, it's okay for us to incur emissions in the exceptional events because the state was able to demonstrate a team. Well, the state was only able to demonstrate a team because they could exclude the data from their exceptional events rule. So, we think that's not a legitimate reason for them to incur any serious emissions that's offered here. I also think that, you know, that's just the level of judgment here because the exceptional events rule, or the state exceptional events rule, made clear that the total health considerations must be taken into account here. So, we've got a huge team of monitors that would be filing a standard. Keep in mind, only one monitor filing a standard is necessary to carry out an examination. Without these six, excuse me, six to leave, 15 monitors in the area would be filing a standard in the examination. And they also are very clear in saying that, you know, the exceptional events rule is not legitimate because that is an area of emission control. So, you know, a long-term care is not going to be safe versus a student-generated care. So, there's also this issue of, you know, alleviating the loss of emissions. Of course, all of these are also part of the exceptional events rules. But, you're saying that's not a legitimate reason for them to incur any loss. Well, I think the OEA has incurred a loss today, which says, you know, they did not believe that they had to incur any loss. They actually did not believe that they had to incur any loss. They actually did not believe that they had to incur any loss. So, I think that, you know, the OEA is entitled to have maximum level controls before the examination. That's what the OEA said in May. And it doesn't, there's just no question that it's right. And there were not maximum level controls in place. Okay. So, but they've never presented their conclusions in respect to that. And, in fact, when you came to this meeting, obviously, you came along to the meeting also saying, hey, it's not really fair that there's a robust official you need to be putting in mandatory multiple carbon standards in order to bring in new lines of this new option, although yes, that's a trade-off. That's a trade-off. I think what you're getting at is you're just saying that you need to bring in new standards. Yes, that's a trade-off. And to bring you the same, you can see up there, there are some people who are saying, you know, we don't know if we have a good system, but it's not there. It seems to me that there are some, I don't know if it's a choice, that people are being rewired. But I think if I answer it, it's a very good guess why. These folks are also saying, you know, they've come to this meeting because they want to talk to us, and they want to get the best of us, and they want to get the best of us, and that's what they want to do. And I think that's one of the reasons that's necessary, and I argue that that's a better thing. Thank you for your time. I'm not going to go into the specifics of the overall meeting. I just think the idea that they're a team, and therefore we can concur in basic team sense, which is the ultimate aim of being a peer-to-peer team, because we know that the goals of being a team is very prominent, and it takes a lot of time and hard work to understand their specifications. But I don't see the team mission turning out to the second issue, which is this idea that they don't need to require the students to use the screen, but it is still a significant requirement in most of the CERES areas. Now, the requirement requires that anyone in either division complies with Part D, and includes part, I think the language is, must be able to meet all requirements of Part D. And Part D, for CERES areas, requires backup. But ETA is taking a position that in the 1789 D Plan, that backup demonstration was not going to be required. And that, in fact, the only way that backup demonstration is required is if either the states or the areas for CERES or if the state makes a modification to their expenditures and submits them to be sent. So, what you have, essentially, is a situation where, since that's what's happening here, the state wants not to include the peer-to-peer, because it knew it wasn't backup, and now it would have led to a disapproval right away. And then, to that end, it's having the peer-to-peer conversation of the relevant states and states, which was, I thought, very reasonable. And so, we made a backup demonstration for peer-to-peer conversation, but they chose not to. And there's something on my side that doesn't really meet these needs, that requires them to make a determination and be a part of it, and a part of it, and a part of it, and a part of it. Okay. So, how do you feel about the separate arbitration of the CERES issue, which is originally a priority for each state, but now it's a priority for each state? Well, I think part of the problem, and this is what, this is more important to me than any versus CERES, is that it's part of our entities, which we have in the Intersectional Agreement, which is, she has said, the state is relying on peer-and-consulted peers, and more important, client-to-peer, that those information should be communicated so that they're federally enforceable. And the state, in the case of N.R.B., who was serving in the Supreme Court, was very clear that this was client-to-peer, and not just the state-run as a basis for trying to have the arbitration controls in place for these control measures, but in, and therefore being able to exclude the data. So, they're not relying on those control measures the way we were. In the N.R.B. case, they're not using any community communication, but they are relying on their BMP and those other control measures. They allow to exclude the data. So, we believe that the arbitration case supports our arbitration and that is what we believe is the right thing to do. MS. HENNEBERGER-RIDDELL So, why is it important that you should be able to choose an arbitration system or a control system? MS. HENNEBERGER-RIDDELL Well, EPA calls it a plan, and it is, they do require contingency measures. They require everything up to the inventory. They require all the system requirements. And, again, according to U.S.C. 74-2, they do not exist as a plan, and the arbitration must be an actual requirement of the contingency. So, by arbitration, it has to be a requirement of contingency. MS. HENNEBERGER-RIDDELL And, in this situation, while EPA is in the area, which requires a plan, the EPA said this month, 1989, the EPA has the arbitration contingency measures in it. So, we continue to do this arbitration, and these are measures that will go into office this year, and this year, and this year, in response to the coronavirus milestones or the COVID-19. And, I tell you, once those have been prepared and managed, the seniors are then going through a planning process to come up with a more adequate plan. But, the idea of contingency measures is that those seniors are immediately going to want to strengthen the control efforts. Now, what EPA is doing is basically undermining their very purpose, because what they're letting seniors do is find these contingency measures that have always been in the EPA's road map that happens in the whole year. So, they call them contingency measures. And, because they have a requirement, and because they don't have to leave them in the contingency agreement, and the problem with that is that it undermines the whole purpose of having these contingency measures in place. So, do you see any way in which they can start to increase the number of contingency measures that are in place? The answer is yes, certainly. The thing, certainly, that we need to keep in mind when thinking about contingency measures is that the language of the statute that you have right here is that a contingency control measure should go to the understander in the language that the instructor said that we have made in place. It was made for a point in history, I think, and it is at all times made in any case earlier to the situation that we are in. But, it is very indicative of what contingency measures are going to look like. To be sure, you only need to look at the statute itself. I think the language of the statute is also important, but I think it is also important that you have a control measure to satisfy the contingency measures. So, that is what I'm hearing. So, part of it is that we need to look at contingency measures. I'm afraid, sir, that there's a lot of people who are holding parties to your table. Do you feel uncomfortable speaking about what we heard in the audience? I don't feel uncomfortable speaking, Your Honor, unless you have a specific question for the State of Arizona, or if you have a question for the State of California, or if you have a question for the State of California. The EPA approved the state's laws and rules in 2012, as they were stating in statements in December 2012. In evidence, I have also confirmed that it seems since 2005, it takes over three years for property class funding as essential business. The EPA's reception has been improving, but it's still getting out of hand. It seems to me, Mr. President, that that's being considered in terms of transparency counsel. I don't care. I'm fine. I think we've already done this. It's been significant to me. So, I'm going to continue to vote for it. I would call to see the approval, Your Honor. The state submitted an extension of the essential business. Submitted approval and status establishing that the, it seems, this is a 25 days that the regulatory standard for an exceptional event showing and under the Congressional statute, by and for an exception for essential events that are tampering, those events are not, are not moving forward. Mr. President, I would like to make sure that the state is fully aware of the changes that have happened. We've seen a lot of improvement in the years up to now. The kind of states that this is an option, that the fact that it's been three years is a principle of approval, but it also says that EPA can rely, this is a lot of time that has improved earlier than the many years that it's been approved. How many years, Mr. Chairman? The many years that it's been approved. Mr. Chairman, I would like to make sure that the state is fully aware of the changes that have happened.   that the fact that it's been three years is a principle of approval, but it also says that EPA can rely, that the kind of states that this is an option, that the fact that it's been approved. Mr. President, I would like to make sure that the state is fully aware of the changes that have happened. How many years, Mr. Chairman? The many years that it's been approved. Mr. Chairman, I would like to make sure that the state is fully aware of the changes    Well, I'm going to say it again, it's a principle of approval,  The fact that it's been approved. In the case of the non-agricultural controls that were adopted in 2002, you can explain in some way the reason why those controls do represent reasonable controls. The non-agricultural controls, for example, access to the primary sources, the technology hasn't changed with regards to construction, or road dust. And in fact, those controls have been made more extensive during the 10-year period. And so, based upon that array of facts, introducing in 2002 was a valid reference point. Mr. Chairman, I think it's very important for you to make a decision about where the numbers are, because you're not going to be able to answer this question without having all the answers to it. So, I'm hoping that you can provide us with more information. The agricultural controls that EPA approved in 2002, EPA registered in the, as I recall, Minnesota's final rule in 2006. I mean, it was a great measure, but it wasn't a measure that was approved. The proposal was based in part upon an emissions inventory. The EPA, the same rule might be said was invalid emissions inventory numbers. The inventory is the same. What are the sources of the various dust contributions to the problem? And in the rulemaking in 2012, the statement that there's a new emissions inventory, and that showed that the contributions to wind, wind load, dust content in agriculture were never less than 1%. Given that small contribution to the problem of reducing the dust in the air, EPA determined that the principles of the Maricopa County outstanding proposed in 2002 were reasonable, given the relative, almost tremendous contribution. I'd like to say, I'm interested in your contributions, but this is a question for Mr. Calhoun. If EPA today were to look at a commitment page, it would go back to the supervisor and say, well, what are some of the contributions to this? And then, are we going to do this as always, and tell me how I'm going to trace it? Well, first of all, the change on the plan is for a specific person. And how is that? The state did not include in its 5% budget any revision of its agricultural control plan. So, it's all back to the supervisor. So, do you see changes in this? Mr. Calhoun? I'm sorry. I thought you said the main thing that the Maricopa County Councils were hoping to do, and you brought up the mental health issue, the mental health issues, but I don't think there's any changes in this. So, I'm not sure I agree with you. I don't agree with you at all. That's correct. The revised emissions inventory showed that agriculture contributed a much smaller portion of the base, and, therefore, there was not a need to explain those control source differences in order to meet the feasible, controllable, and predictable standards. And I would like to respond to a point that the Maricopa County Councils made regarding looking at the sources of insubstantial events. In this case, if you look at the submissions made by the state and by EPA, it was the agricultural sources in the 19th period that are leading to the existence of insubstantial events. For example, in August of 2012, and it was highlighted in our brief, the state identified on the source of those large, the source of the disease, the monitors that stated that the source was likely under the land use consisting of natural undisturbed desert south of the Maricopa area. So, what we're dealing with is winds picking up dust from undisturbed desert south of the Maricopa area, bringing that dust against insubstantial COVID areas and causing these incidences. Local agricultural or natural disease, which are common in the area, are not causing these incidences. If you go through the summary of the advanced submissions, in the advanced submissions record, we're highlighting that in section 10, it was the repeat of things that the state identified as the source of the incidences. We're highlighting that some of this is originating outside the area, and flowed into some areas, and onto some areas. For example, July 3rd through July 8th, 2012, there were 29 incidences. And the state, in its initial statement, that the source was from deserts of the Alameda and southern Maricopa counties in the ocean, the amount of dust generated locally was at least an overwhelming 1. And according to the UN, there were several areas that dust was transported, even from the source regions. So, you can see that these submissions are looking through meteorological equipment, and we have photographs, you know, being shown, and it's used, dust forms are being generated outside the non-desert area, in deserts, desert climbers, natural climbers, being all incidences, and that is the source of the incidences. Now, it doesn't understand the contribution from agricultural lands within the Alameda area, and into the Alameda province, and we're waiting all the time to assess these findings. EPA basically concluded, and did concur with you, that these full controls were in place, because traditional controls are not going to reduce the amount of dust being taken from the desert, and flown into this, obviously, in an area of concern. Okay. So, one of the things that we also know, and I know you all know this, is that there was a disaster in Tijuana, just recently, in August of 2017, and some of this was, obviously, from the outside air, which made it, in this environment, there is a requirement for the full and strict controls to occur, and in this case, EPA found, based on sufficient statistics, that those areas were in strict control, and it's important to look at this in context. Those areas are not part of the non-obtainment target. There's no requirement for backup. There's no requirement for more strict controls. Okay. So, we're not just talking about the same area of concern, where this is from. So, there were controls in place outside the non-obtainment area, and certainly, not as strict as part of the non-obtainment area, but those controls were useful, given the status of those various factors, and how the EPA has designated those areas as not to even be required. There's a lot more to those strict controls. At the time of this decision, and in the time since, and in this fire, clearance, and acceptable conditions for patients, there were controls in place. The state established those were reasonable controls, meaning they could be heard, and then, of course, the guidance, the reasons, the controls, the terms, but the extended status of those particular areas. So, we just need to make sure that, certainly, in this jurisdiction, there are a number of controls, as long as they meet the requirements for clearance. Okay. So, as to the next slide, if, if, if they do not, avoid revised patented control controls in the city, there's no, that's not a trigger, but the trigger is, Arizona cannot meet attainment at some point in the future. It is a consequence of, it tells the state, you're not in attainment, you have to impose additional controls, and you need to go to a cultural and ethnic peoples' council in order to enforce those regulations. What's important to note, is that there is a collaboration between states, and the federal government, and the states, which is a key entity that takes the primary role in, in making controls in the state, and chooses to implement controls on construction sites, on gravel yards, on, on resources, and for whatever reasons, doesn't want to impose controls on their own culture. If they do not meet the standards, then EPA approves, and that's the state's choice. It is the task of the entity that, that can meet attainment, that can meet the standards, that EPA can, that can meet the standards, that EPA can meet the standards. There's a real situation, where fire prevention actually exists in the state. Could you also suggest, on the interpretation of the emergency meeting, that the measures you're mentioning, the fire emergency meeting, is based on what interpretation of the state's decision to implement those measures, by the input, implementation of specific measures, and could be implemented, based on the state's very features in the state? Well, it should be undertaken, that you look forward, and talk about, the state's measures, in the form of the fire emergency meeting. The fire emergency meeting, is a, a fire emergency meeting, which is, a, a, a, a, a, a, a, a, a, a, a, a, a,  a,  a,      a,  a,  a, a, a, a, a, a, a. Just that comment, as one of the solutions that's out there, to make adjustments that would alleviate, and it's a city, has contingency measures in place. Why wait, three years, five years, for those steps to be triggered, when, the city, should have been, in the evidence, we're talking a lot about, the solution that's out there, to make adjustments, that alleviates, the problem, that we need to address, if we can, if we can, if we can. No, no, no, I don't think the literal language of the statute does say that. It's, it's taken, measures have to take effect, in case of case, without further action, by the city or the administration. These are actions, that are taking effect, without further action, by the city or the administration. And they can be done, early, as the case consistently held for 20 years. The, purpose of these contingency measures, is to, assert, a statement, of the standards, and the, the steps, and the specificities, that we're talking about, are the paving, approach, and the civil use approach, which, will provide permanent, reductions, in, the amount, of those events, that, may have, or, may or may not have, taken effect, in this case, without further action. Now, that there, did take effect, without further action, as this case, the paving, approach, provisions, that were implemented by the state, have taken effect,   and the administration, and the, city fell years, years, before paving was already, they,  they,  the,  the,   before paving was already, they, they, they,    years. The actor said that, about the 1000 feet of the city, the same, the city the same, the city people like. people like. 1000 feet of city. Few people like. people like. So, So, the decision to customize, the, the design of the city, was to be a decision, that did not bring, to the courts of extension, to the courts of extension, that associated, associated, associated, associative areas and addresses, where the city issue came from, and how the city issue came from, in the context of the 5% plan, in which the city, the city's 1% voted, it's 5% of the city, more than 5% in the first years, and less in the second, and more than 5 years, and, was challenged, and the court agreed with, the GTA, that, it was not reasonable, to have the address, or the benefits, or the firm hire, the individual firm, and concluded, in the, in 1996, by providing, by providing, by providing material, that's good, for implementing the motion, that measures as clearly as possible, the various properties, of this portion of the plan, to this court, to recognize, that, the GTA, the risk, and the observance, of this, the interactive, 5% plan, to provide, earlier, more expeditious, reductions, in the disadvantages, of this, and that, is appropriate, and reasonable choice, to submit, that motion. With that, we're almost at the time, of the court, to provide a decision, for review, and to support, those questions, on the motion.   Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I think, that the best, from the, from the, from the, city of Dallas, UT's argument, is, the, the local's argument, that this plan, provides, for a 5% reduction, in gross, year of quality, and, the only, cost layer, is paid for, 103, for new spaces, and 50, monitors, that are violating, the standards. So, as I, as I was, working on this case, I always, prepare to, give, water rights, administration, to companies, for water, and clean water, and I feel like, it seems, exactly as presented here, we've got, paper, attainment, where they demonstrate, the attainment, of a great deal, and then we've got, the actual, year of quality, that people are creating, and these, concerns, are horrendous, and need to, absolutely go on, for days, and weeks, to have you, they get the area, and we understand, that these, highly, independent, of a problem, and instead, you can't, tackle it, but you can, enclose, the outcome, and you can, require the outcome, of someone, who gets the area, and I know, a lot of people have, communities outside, the area, we are, doing, EPA, is right there, so we're probably, safe to know, that it's been going on, for over 10 years, since you started, with the housing, and you've been, able to help, people, in their search, for housing, and you're, now, a certified, PE, and started, a community, inventory, and a foundation, that you're, going to have, a really, really, open, and high end, community inventory, as we are, in this piece, first, so, it's only when, you flatten it out, over three years, that you can, start, the team, to make, the search, and start,  the pieces, and most importantly, the connections, to the community, and to the families, and to the neighbors, and to the parents, and now,   you're certified, and you're, able, to help, more, and more, people, in their search, for housing, and you're, now,
judges: Clifton, Ikuta, Hayes